**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., et al.,[1] | ) |
|  | ) Case No. 15-01145 (ABG) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

**DEBTORS' REPLY TO THE NATIONAL RETIREMENT FUND'S OBJECTION TO MOTION FOR ENTRY OF AN ORDER (I) ENFORCING THE AUTOMATIC STAY WITH RESPECT TO THE DEMAND FOR INTERIM WITHDRAWAL LIABILITY PAYMENTS BY THE NRF, (II) VOIDING SUCH PAYMENT DEMANDS TAKEN IN VIOLATION OF THE AUTOMATIC STAY, AND (III) GRANTING RELATED RELIEF (THE "DEMAND REPLY")**

---

[1] A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained at https://cases.primeclerk.com/CEOC.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this reply to the NRF's objection [Dkt. No. 1142] (the "362 Demand Objection") to the *Debtors' Motion for Entry of an Order (I) Enforcing the Automatic Stay with Respect to the Demand for Interim Withdrawal Liability Payments by the NRF, (II) Voiding Such Payment Demands Taken in Violation of the Automatic Stay, and (III) Granting Related Relief* (the "362 Demand Motion") [Dkt. No. 1018].[1]

**Preliminary Statement**

1.      The Quarterly Payment Demand violated the automatic stay, and the Quarterly Payment Demand is void. No matter how styled, the Quarterly Payment Demand seeks to assess an otherwise contingent claim against the Debtors' estates and to exercise control over the Debtors' assets. These actions clearly violate the automatic stay. In re Nortel Networks Corp., 426 B.R. 84, 91 (Bankr. D. Del. 2010) ("[P]ost-petition attempts to assess, impose and/or liquidate a debt against a Chapter 11 debtor outside of the bankruptcy court go to the essence of the Chapter 11 claims process, and are the very reason why there is an automatic stay."). In response, the NRF argues that: (a) section 362 does not apply to non-debtors; and (b) the Seventh Circuit has held that a multiemployer pension fund may always seek payment from non-debtor control group members without violating the automatic stay. The NRF further argues that these matters can be resolved as a matter of law without discovery or a trial by a finder of fact. These arguments are wrong.

2.      First, contrary to its promise in the standstill agreement (the "Standstill Agreement") entered into by the parties on March 20 2015 [Dkt. No. 944], and its representation

---

[1]   Capitalized terms used but not defined herein have the meanings ascribed to such terms in the 362 Demand Motion.

to the Court,[2] the NRF has <u>not</u> filed a dispositive motion solely on "matters of law" directed at the Debtors' 362 Demand Motion.  Moreover, the Debtors' allegations that they are the "real parties in interest" with respect to the NRF's Quarterly Payment Demand to CEC and CERP are disputed and factually intensive ones that cannot be resolved without evidence and a hearing. The Court should thus decline to deny the 362 Demand Motion without first allowing discovery and a hearing.

3. <u>Second</u>, the 362 Demand Motion should be granted because, but for the automatic stay, the NRF's actions would liquidate withdrawal liability claims against the Debtors' estates outside the claims process fixed by section 502 of the Bankruptcy Code.  Thus, the Quarterly Payment Demand violated sections 362(a)(3) and 362(a)(6) of the Bankruptcy Code by seeking to exercise control over the Debtors' assets and assess a claim against the Debtors outside this Court.  The Quarterly Payment Demand cements the NRF's attempt to improperly expel the Debtors by actually assessing a claim against the Debtors' estates arising from the disputed expulsion.[3]

4. <u>Third</u>, the Seventh Circuit case law which the NRF asserts gives it <u>carte blanche</u> to proceed against non-debtors is not definitive and did not address the peculiar facts presented by this case.  Contrary to the NRF's statements, and as confirmed by this District, the Seventh Circuit has not decided whether a notice and demand for payment of withdrawal liability to a non-debtor would violate the automatic stay.  And the Seventh Circuit has certainly never

---

[2] "With respect to this [362 Demand Motion], . . . the NRF would also file a dispositive motion that we think, just like the other motion, can be dismissed without getting into facts, or without getting into discovery, on a legal basis." March 25, 2015, Hr'g Tr. 59:4–9.

[3] The claims bar date has not yet occurred.  The Debtors expect the NRF will file a claim on account of selfsame liability.  (<u>See</u> [Dkt. No. 1510].)

2

addressed the unique facts of this case, which involve the purported and disputed unilateral expulsion of CEOC despite its express desire to remain part of the NRF.

## Argument

I. **The NRF Has Not Filed a Dispositive Motion on Legal Issues Pursuant to the Standstill Agreement**

5. Pursuant to the Standstill Agreement, the NRF promised to move to dispose of the Debtors' NRF motions on pure "matters of law" by April 13, 2015. (Standstill Agmt § 1(a).) On March 25, 2015, counsel to the NRF confirmed this intention with respect to the 362 Demand Motion (filed after the March 25 hearing). (March 25, 2015, Hr'g Tr. 59:4–9.)

6. However, the NRF's objection to the 362 Demand Motion does not move to dispose of the 362 Demand Motion on purely legal issues. Instead, as highlighted in this reply, resolution of this matter requires the Court to make factual determinations regarding the effect of the NRF's Quarterly Payment Demand on the Debtors' assets. Though the NRF could have filed a motion for summary judgment under Bankruptcy Rule 7056 to dispose of the matters in the 362 Demand Motion, it did not do so. The Debtors submit that a ruling on the 362 Demand Objection therefore should be deferred pending discovery respecting the disputed facts on which the NRF relies. These factual disputes include the following: (a) that the Debtors are likely to be bound by the NRF's pursuit of withdrawal liability from non-Debtors; (b) that the Expulsion and associated Quarterly Payment Demand, if not defeated in litigation, will dramatically increase the Debtors' liabilities; (c) that the Quarterly Payment Demand follows upon an invalid Expulsion Notice from the NRF; and (d) that the Quarterly Payment Demand imperils the RSA.

II. **The NRF Violated Sections 362(a)(3) and 362(a)(6) By Sending the Quarterly Payment Demand.**

7. The automatic stay prevents the "chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings." In re Rimsat, Ltd., 98 F.3d 956, 961

3

(7th Cir. 1996) (Posner, J.) (citations omitted).  The automatic stay therefore applies where a proceeding "imperil[s] the orderly administration of the bankruptcy proceeding, and by doing so [imposes] an indirect threat to the estate."  Id.  The automatic stay thereby "protects the bankrupt's estate from being eaten away" by individual creditor actions before the debtors can "marshal the estate's assets and distribute them equally among the creditors."  Martin-Trigona v. Champion Fed. Savings & Loan Assoc., 892 F.2d 575, 577 (7th Cir. 1989) (Posner, J.).  It is for this reason that the automatic stay, working in conjunction with the broad definition of estate property established by section 541(a), channels claims to the bankruptcy court and stays all actions or proceedings against a debtor's property interests that are taken outside of the bankruptcy court.  See 11 U.S.C. § 541(a)(1); see also United States v. Whiting Pools, Inc., 462 U.S. 198 204 (1983) ("[T]o facilitate the rehabilitation of the debtor's business, all the debtor's property must be included in the reorganization estate.").

8. The application of the stay to the Quarterly Payment Demand is simple.  Under ERISA, all members of a controlled group are treated as a single entity.  29 U.S.C. § 1301(b)(1). As a result, notice and demand of payment of withdrawal liability to one member of the controlled group is notice and demand for payment to each and every member of the controlled group.  See Tr. of Chi. Truck Drivers, Helpers and Warehouse Workers Union (Indep.) Pension Fund v. Cent. Transp., 888 F.2d 1161, 1163 (7th Cir. 1989).  Similarly, a judgment for withdrawal liability can be collected from any controlled group member no matter which member is the actual target of a legal proceeding.  Cent. States, Se. & Sw. Areas Pension Fund v. Rogers, 843 F. Supp. 1135, 1140 (E.D. Mich. 1992) ("Under the principles of joint and several liability, plan sponsors can sue one or more of the members of a common control group, and can collect the entire judgment from one or more of them.").

4

9. Because the Debtors will be jointly and severally liable for any withdrawal liability owed by any member of the Caesars Controlled Group, any notice or demand for payment would necessarily assess and seek to collect from the Debtors' estates. And, but for the automatic stay, the Quarterly Payment Demand initiated a process in which the Caesars Controlled Group must review NRF's calculated withdrawal liability, and then, if not satisfied with such review, initiate arbitration pursuant to the provisions of 29 U.S.C. § 1401(a)(1). Failure to participate in this process and arbitration will bind the Debtors to the withdrawal liability claim and the amount thereof that is ultimately determined in proceedings among non-debtor parties <u>outside</u> this Court.

### A. The Quarterly Payment Demand Violates Section 362(a)(6) By Assessing a Claim Against the Estates.

10. Section 362(a)(6) stays "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(6). It is hornbook law that the "term 'act' is broadly construed." 3-362 Colliers on Bankruptcy ¶ 362.03 (16th ed. 2015). It is equally clear that the withdrawal liability at issue here is a prepetition claim against the Debtors' estates. See <u>Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.</u>, 789 F.2d 98, 101 (2d Cir. 1986) ("The history of the MPPAA demonstrates that the employer's lump sum payment in satisfaction of his withdrawal liability is made to guarantee pension benefits already earned by those employees covered by the Plan. . . . It is attributable to the period pre-dating the filing of the Chapter 11 petition."). A creditor also violates section 362(a)(6) where it sends notice purporting to assess a prepetition liability against a debtor. See <u>In re AMR Corp.</u>, 730 F.3d 88, 102–03 (2d Cir. 2013) (holding that "sending of a rescission notice and contractual deceleration of [] debt" violates section 362(a)(3) and section 362(a)(6)); <u>In re Solutia Inc.</u>, 379 B.R. 473, 485 (Bankr. S.D.N.Y. 2007) (holding that sending a

5

notice of acceleration of debt "violated the automatic stay" and was "void"); In re MPM Silicones, LLC, No. 14-22503, 2014 WL 4436335, *19 (Bankr. S.D.N.Y. Sept. 9, 2014) (holding that "sending of a rescission notice" regarding deceleration of debt violates section 362(a)(6)).

11.     The bankruptcy court's holding in In re Nortel Networks Corporation, 426 B.R. 84, 91 (Bankr. D. Del. 2010), is instructive.  There, a bankrupt debtor in the U.S. had affiliates in Canada and the United Kingdom, and those foreign affiliates were subject to their own separate insolvency proceedings.  The United Kingdom's pension regulator sent a notice to the U.S. debtor's foreign affiliates (none of which were debtors in the U.S. bankruptcy case) assessing certain funding amounts on those foreign entities.  These notices would initiate an administrative process in the United Kingdom.  The United Kingdom's pension regulator also filed a proof of claim based on the same liabilities in the U.S. debtor's bankruptcy.  The bankruptcy court found that the notice violated the automatic stay because, among other reasons, sending the notice was an act to assess a claim as prohibited by section 362(a)(6).  Id. at 90–91.  The Nortel bankruptcy court was unequivocal on this point:  "Post-petition attempts to assess, impose and/or liquidate a debt against a Chapter 11 debtor outside of the bankruptcy court go to the essence of the Chapter 11 claims process, and are the very reason why there is an automatic stay."  Id. at 91.

12.     Nortel applies here.  Because ERISA treats notice to one as notice to all, see Cent. Transp., 888 F.2d at 1163, the Quarterly Payment Demand sent to the Debtors' non-debtor affiliates "was an attempt to increase the size of the claim" held by the NRF against the Debtors' estates.[4]  See also Solutia, 379 B.R. at 485.  Although, as in Nortel, the notice was sent to non-debtors, by operation of ERISA the notice would, absent the protections of the Bankruptcy Code invoked by the Debtors' motions, bind the Debtors to the determination of the withdrawal

---

[4] Moreover, the Quarterly Payment Demand was sent to Timothy Donovan, CEOC's Chief Regulatory and Compliance Officer.  CEOC therefore had actual notice of NRF's demand.

liability assessment and it would do so outside this Court's claims process. Such a notice therefore "assesses" a claim against the bankruptcy estate in clear contradiction of section 362(a)(6).

### B. The Quarterly Payment Demand Seeks to Obtain Possession of Estate Property in Violation of Section 362(a)(3).

13. Sending a notice that seeks to assess claims against a debtor's estate violates section 362(a)(3) because it is an "act to obtain possession of property of the estate." 11 U.S.C. § 362(a)(3); Solutia, 379 B.R. at 485–85 (Bankr. S.D.N.Y. 2007); MPM Silicones, 2014 WL 4436335 at *19. For example, in In re Solutia Inc., 379 B.R. 473, 485 (Bankr. S.D.N.Y. 2007), the bankruptcy court found that a notice that accelerated the payment of certain notes, which would result in a potential "make whole" claim, was an act to control estate property because "it is a direct attempt to get more property from the debtor and the estate . . . through a simple increase in the amount of a pro-rata plan distribution." 379 B.R. at 485. The Quarterly Payment Demand is no different: it would liquidate otherwise contingent withdrawal liability against the Debtors in an attempt to increase the NRF's overall recovery.

14. The automatic stay applies to any act that attempts to obtain possession of, or exercise control over, estate property, including acts against non-debtor third parties. See Nat'l Tax Credit Partners L.P. v. Havlik, 20 F.3d 705, 707 (7th Cir. 1994). This is so because section 362(a)(3) "reaches farther" than other automatic stay provisions, "encompassing every effort to 'exercise control over property of the estate.'" Id. Thus, where an action against a non-debtor affects the debtor's property interests, that action violates the automatic stay. See id.; In re 48th St. Steakhouse, Inc., 835 F.2d 427 (2d Cir. 1987); Greate Bay Casino Corp. v. Greate Bay Hotel & Casino, Inc., No. CIV. A. 99-1499 (JEI), 1999 WL 378758, at *5 (D.N.J. June 10, 1999) ("Although contracts between two non-debtors are not normally subject to the automatic

7

stay, these contracts will be subject to the stay when their termination will impact the debtor by destroying the debtor's property.").

15. Intentionally or not, the NRF exercised control over estate property because the Quarterly Payment Demand starts a process whereby the Debtors' liability—which will set the amount of the NRF's claims for purposes of its recovery—will be determined. See Rogers, 843 F. Supp. at 1143–44 ("[O]nce the liability becomes fixed, the amount assessed is due and owing from whomever may later be found to be within the common control group. And members of a common control group are jointly and severally liable for withdrawal payments.").

16. To evade this result, the NRF claims that it does not believe Debtors would be bound by an arbitral determination against non-debtors. (362 Demand Obj. p 3.) But this assurance can be found nowhere in the Quarterly Payment Demand and, moreover, it is contrary to ERISA. See 29 U.S.C. §§ 1002(5), 1301(b)(1). The NRF has cited to no provision of the law that excuses the Debtors from being bound by an arbitral decision fixing withdrawal liability, nor does the NRF explain how it could be possible to determine the liability for some members of the Caesars Controlled Group outside these chapter 11 cases and the liability for the Debtors (also members of the Caesars Controlled Group) in these chapter 11 cases, without running the clear risk of inconsistent judgments that would only further confuse matters. But this confusion is precisely what the Bankruptcy Code prevents. Moreover, the risk of this confusion is high, as the NRF has explicitly reserved its right to pursue claims against the Debtors, stating that "[t]he NRF reserves the right to receive any distributions to which it may be entitled as a creditor." (362 Demand Obj. p. 3 n.9.)

    **C.**    **The Case Law Cited by the NRF is Inapposite and Nonbinding.**

17. The NRF relies heavily on Seventh Circuit dicta and extra-jurisdictional precedent for the claim that section 362(a) does not bar withdrawal liability payment demands to

8

non-debtor members of a debtor's controlled group. (362 Demand Obj. pp. 5–6.) Contrary to the NRF's assertions, the Seventh Circuit has never held that a demand for withdrawal payments does not violate the automatic stay. See Great Am. Mgmt. & Inv., Inc. v. Paper Indus. Union Mgmt. Pension Fund, No. 94-C-6226, 1994 WL 673055, at *4 (N.D. Ill. Nov. 28, 1994).

18. The primary case relied on by the NRF is Central States, Southeast & Southwest Areas Pension Fund v. Slotky, 956 F.2d 1369 (7th Cir. 1992). In Slotky, a multiemployer pension fund filed suit to recover withdrawal liability from the sole shareholder of a bankrupt entity which had withdrawn from a pension fund after filing for bankruptcy. The Slotky court addressed a number of different issues: whether a party was a member of the controlled group; whether notice to the defendant was adequate; whether the deadline to arbitrate would be equitably tolled; and whether certain damages and fees were properly added to the withdrawal liability. Id. at 1375. The court held that the defendant in that case was liable for the withdrawal liability assessed against him, and that notice was adequate. Id. Thus, for purposes of notice to the non-debtor, the question of whether the automatic stay applied as to the debtor was not necessary for the ruling and not reached by the court, and Slotky did not consider the critical question presented here: "does notice and demand to the non-debtors constitute notice and demand to the Debtors?"

19. This reading of the Slotky opinion is corroborated by the United States District Court for the Northern District of Illinois, which has stated that "[t]he Slotky court did not determine definitively whether a notice and demand for withdrawal liability payments would violate the automatic stay." Great Am., 1994 WL 673055 at *4.[5] Moreover, this district has

---

5 In a subsequent case, the Seventh Circuit again did not definitively reach the question of whether the payment demand would violate the automatic stay. Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc., 252 F.3d 911, 918 (7th Cir. 2001) (noting that

stated that "The <u>Slotky</u> court's musings as to whether a demand and notice for withdrawal liability payments can be analogized to an outright suit against the bankrupt indicates that the resolution of the issue requires a thorough analysis of the automatic stay provision of the Bankruptcy Code, not a thorough analysis of ERISA" <u>Id.</u>  Unlike here, there was no dispute in <u>Slotky</u> that the applicable employer had in fact voluntarily withdrawn from the pension plan prior to the issuance of the payment demand in question.  <u>See Slotky</u>, 956 F.2d at 1372.  Nor had the debtor objected to the assessment of withdrawal liability.  <u>Id.</u> at 1372.  Put differently, the multiemployer plan in <u>Slotky</u> was not commencing a process when it issued its demand for payment—the debtor had initiated that process by choosing to withdraw.  That is obviously not the case here, where CEOC and its subsidiaries all vigorously dispute that they can be expelled against their will from the NRF, and have repeatedly promised to keep up their contributions in the ordinary course.

20.     Moreover, <u>Slotky</u>'s consideration of the automatic stay was itself limited to analysis of section 362(a)(1).  <u>See Slotky</u>, 956 F.3d at 1376 ("[T]here is admittedly an analogy between an outright suit against the bankrupt, which would incontrovertibly violate the stay, **§ 362(a)(1)**, and a notice and demand that kicks off a sequence of conciliation and arbitration . . . ." (emphasis added)).  <u>Slotky</u> in no way considered application of either section 362(a)(3) <u>or</u> section 362(a)(6) in its opinion—and logically would not have given that <u>Slotky</u>'s debtor voluntarily caused its own withdrawal.  But where, as here, the debtor does not concede that it has withdrawn, the questions of whether the fund violated the automatic stay by assessing withdrawal liability on a postpetition basis, <u>cf.</u> <u>Nortel Networks</u>, 426 B.R. at 91–93, or whether the fund wrongly exercised control over estate assets, <u>cf.</u> <u>Havlik</u>, 20 F.3d at 708, remain

---

"the demand for payment of withdrawal liability is <u>probably</u> an exception to" the automatic stay (emphasis added)).

10

very much at issue. Thus, Slotky simply cannot be read to excuse the NRF's actions to deprive CEOC of valuable contract rights from section 362(a)(3) or to exempt the NRF's attempt to liquidate previously-contingent withdrawal liability from section 362(a)(6). Any assertion to the contrary is simply wrong.

21.   Further, the Seventh Circuit's ruling in Trustee of Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Central Transportation, 888 F.2d 1161, 1163 (7th Cir. 1989), makes clear that the automatic stay would equitably toll any deadlines or process triggered by the Quarterly Payment Demand. Id. ("[T]he filing in the bankruptcy court by the Fund, accompanied by a timely response by the defendants, tolled the time period for seeking arbitration under section 1401(a)(1)."). Finally, unlike Slotky, here the NRF has stated its intention to file a proof of claim, thereby subjecting itself to the bankruptcy claims resolution process and, implicitly, the automatic stay which operates to channel claims to the bankruptcy court.

22.   The NRF also relies on a case from the United States Court of Appeals for the District of Columbia, I.A.M. National Pension Fund, Plan A, A Benefits v. Slyman Industries, Inc., 901 F.2d 127 (D.C. Cir. 1990), which case is inapposite to the facts here. There, the pension fund sent a withdrawal liability demand and notice to a debtor and also filed a proof of claim against that debtor. Id. at 128. None of the debtor's non-debtor affiliates moved to arbitrate the withdrawal liability assessment, and the debtor did not object to the proof of claim or assert an automatic stay violation. Id. Subsequently, the fund obtained a judgment for withdrawal liability payments from two other members of the controlled group due to their failure to comply with ERISA's administrative and arbitration provisions regarding the withdrawal liability assessment. Id. at 129. When the debtor was dismissed from bankruptcy,

11

the fund moved to have the judgment apply to the debtor, and was successful. Id. On appeal, the Slyman court found that all parties were bound to the assessment because none of the entities, including the debtor, "sought review of, nor otherwise contested, the Fund's claim, either in or out of the bankruptcy court." Id. at 129. The court there also rejected arguments about the automatic stay because they were untimely. Id. at 129–30.

23. As an initial matter, Slyman does not stand for the proposition that the notice did not violate the automatic stay; Slyman did not even consider that argument due to untimeliness. Id. at 128. Moreover, the Slyman court's reasoning emphasizes the importance of the effects of the Quarterly Payment Demand at issue here, because the debtors in Slyman were bound to their failure to arbitrate. Id. at 128 ("Neither [the debtor] nor either of the other companies in the group made any payments under the Schedule provided by the Fund, nor did any of them take any steps to obtain review or arbitration of the Fund's demand within the time limits established by the MPPAA."). Thus, read correctly, Slyman supports the Debtors' position that it will be bound by any determination the NRF obtains against the non-Debtors. In such an instance, it is clear that the Quarterly Payment Demand both assesses a claim against the Debtors' estates and is an act to obtain control of the Debtors' estates' property, both in violation of the automatic stay.

24. At core, neither Slotky nor Slyman provide guidance for the circumstance of this case. Neither case addresses the scenario presented where the debtor disputes the validity of its purported expulsion from a pension fund on a postpetition basis as a result of prepetition acts. Slotky and Slyman were "mopping up" cases where the Debtor's actions had precipitated the withdrawal, and there was no reason to stop the fund from taking the logical next step against members of the controlled group. In vibrant contrast, the Debtors here vigorously contest the

validity of their expulsion from the NRF and have continued to make payments to the NRF (payments which the NRF refused to cash prior to the entry of the Standstill Agreement). This is thus no "mopping up" action by a fund against a moribund debtor who has voluntarily shirked its payment obligations—but rather a live controversy between the Debtors which very much want to remain in the NRF and the NRF that is opportunistically seizing on the Debtors' bankruptcy to gain an advantage. The Quarterly Payment Demand should thus be viewed, in this unique context, as a knowing attempt by the NRF to cement the effects of its improper expulsion of the Debtors, to set the amount of its purported claim against the Debtors outside the procedures established by Congress in the Bankruptcy Code, to disrupt the RSA between the Debtors and CEC, and to apply additional pressure to all members of the Caesars Controlled Group, including the Debtors.

### III. The Automatic Stay Voids the Quarterly Payment Demand.

25. If the Quarterly Payment Demand violated the automatic stay (which it does), then such "actions taken in violation of the automatic stay are void ab initio." See Raymark Indus. v. Lai, 973 F.2d 1125, 1132 (3d Cir. 1992). This is sound policy, because "the fundamental importance of the automatic stay to the purposes sought to be accomplished by the Bankruptcy Code requires that acts in violation of the automatic stay be void, rather than voidable." Garcia v. Phoenix Bond & Indem. Co. (In re Garcia), 109 B.R. 335, 340 (N.D. Ill. 1989). If an action violating the stay were not void, it "would have the effect of encouraging disrespect for the stay by increasing the possibility that violators of the automatic stay may profit from their disregard of the law." Id. Treating such violations as only voidable would place "the burden of validating the action after the fact squarely on the shoulders of . . . the offended debtor." In re Soares, 107 F.3d 969, 976 (1st Cir. 1997); see also In re Schwartz, 954 F.2d 569, 571 (9th Cir. 1992) ("If violations of the stay are merely voidable, debtors must spend a

13

considerable amount of time and money policing and litigating creditor actions. If violations are void, however, debtors are afforded better protection and can focus their attention on reorganization.").

26. The NRF does not even attempt to refute this point in the 362 Demand Objection, but rather notes that the Seventh Circuit has not held that actions in violation of the stay are void. In other words, the NRF does not question the policy or basis for finding such actions void. The Debtors respectfully submit that the NRF's violation of the automatic stay must be found void. Moreover, the NRF will not be prejudiced by such a finding because the withdrawal liability can and will be litigated in this Court as part of the section 502 claims process.

27. Application of the automatic stay will not "eviscerate" the NRF's rights under ERISA—it will only change how it must assert them. Instead of creating chaos by unilaterally asserting claims against the Caesars Controlled Group, the NRF will merely be forced to establish that cause exists to lift the stay. Such a result harmonizes well with the Bankruptcy Code's policy of channeling all claims into the bankruptcy court to allow for their orderly liquidation.

## **Conclusion**

28. For the foregoing reasons, the Debtors respectfully request that the Court grant the Debtors' 362 Demand Motion, or, alternatively, the Court should order discovery to proceed on the disputed factual issues.

|  |  |
|---|---|
| May 11, 2015<br>Chicago, Illinois | Respectfully submitted, |

*/s/ Stephen C. Hackney*

| | |
|---|---|
| James H.M. Sprayregen, P.C. | Paul M. Basta, P.C. |
| David R. Seligman, P.C. | Nicole L. Greenblatt |
| Stephen C. Hackney | **KIRKLAND & ELLIS LLP** |
| **KIRKLAND & ELLIS LLP** | **KIRKLAND & ELLIS INT'L LLP** |
| **KIRKLAND & ELLIS INT'L LLP** | 601 Lexington Avenue |
| 300 North LaSalle | New York, New York 10022-4611 |
| Chicago, Illinois 60654 | Telephone:  (212) 446-4800 |
| Telephone:  (312) 862-2000 | Facsimile:  (212) 446-4900 |
| Facsimile:  (312) 862-2200 | |

*Proposed Counsel to the Debtors and Debtors in Possession*